BAGLEY *v.* COLUMBUS SOUTHERN RWY. CO.

1. A justice's court has no jurisdiction of an action for damages to realty.
2. Fences permanently affixed to land constitute a part of the realty; and, as a general rule, unmatured crops growing upon land belonging to the owner of the crops are to be regarded as part and parcel of the land.
3. It follows that a justice's court has no jurisdiction of an action for damages alleged to have been occasioned by the negligence of a railway company in setting fire to and burning fences enclosing the plaintiff's land, and causing damage to his pasture and to a crop of unmatured cotton growing in his field.

June 18, 1896. By two Justices. Argued at the last term.

*Certiorari.* Before Judge Butt. Chattahoochee superior court. March term, 1895.

*Leonidas McLester*, for plaintiff.
*Battle & Miller*, for defendant.

SIMMONS, Chief Justice.

1. Under the constitution of 1877, the jurisdiction of a justice's court over actions arising *ex delicto* is confined to "cases of injuries or damages to *personal* property." Code, §5153; *James v. Smith & Bro.*, 62 *Ga.* 345, 347; *Mayor etc. of Cartersville v. Lyon*, 69 *Ga.* 577, 580; *White Star Line Steamboat Co. v. County of Gordon*, 81 *Ga.* 47. It follows that a justice's court has no jurisdiction of a case in which the plaintiff seeks to recover damages for an injury to realty caused by the wrongful act of the defendant.

2. In the present case, which was commenced in a justice's court, the plaintiff alleged that the defendant railway

company "did carelessly set fire to and destroy and burn a certain cow pasture and about 300 yards of fencing and about one half acre of cotton growing in the field, the property of complainant, and all of the value of $25.00." Whether the magistrate had jurisdiction to entertain the suit must depend, therefore, upon whether the property alleged to have been thus destroyed is legally to be considered and characterized as personalty or as realty. The burning of the plaintiff's "cow-pasture" can scarcely be regarded as anything less than an injury to realty; indeed, to characterize such an injury merely as damage to personalty, would appear to be an euphemism unwarranted under the strict rules of law. If the plaintiff really intended to aver that the grass or other natural herbage growing upon his pasture land was destroyed by fire, still such damage is to be legally considered as an injury to realty. "Growing crops, if *fructus naturales*, are part of the soil before severance." 4 Am. & Eng. Enc. of Law, 894. "It is generally held that growing trees, fruit and *grass*, are parcel of the land." Tyler on Fixtures, 735. As we shall hereinafter more fully discuss the nature of growing crops and their legal status, we may dismiss, for the present, further consideration of the plaintiff's claim of injury to his pasture, and pass to a discussion of the character of the damage he sustained by reason of the burning of his fences.

"A fence is generally considered to be a part of the realty." 7 Am. & Eng. Enc. of Law, 905, 906, citing cases. And to the same effect, see Tyler on Fixtures, 116, 132, 133. Certainly, where the owner of lands builds or maintains thereon a substantial fence, as a permanent structure constituting an improvement of the premises, such fence becomes as much an integral part of the realty as would a house or brick wall erected thereon. Our code settles this question, for it is declared in section 2219 that: "Anything intended to remain permanently in its place, though not actually attached to the land, *such as a rail*

*fence*, is a part of the realty." So the burning of the plaintiff's fences is likewise to be regarded as damage to realty.

Our main difficulty in disposing of the question of jurisdiction raised in this case has been to properly determine the legal character of the third item of damage claimed by the plaintiff, arising out of the destruction of unmatured cotton growing in his field. Many of the modern textbooks, and numerous adjudicated cases, have been adverted to during the course of our investigation; but with a result tending rather to confusion than to practical aid, so far as concerns a correct determination of the question whether, at common law, growing crops were characterized as personal or as real property. For instance, Mr. Freeman says: "Crops, whether growing or standing in the field ready to be harvested, are, when produced by annual cultivation, no part of the realty." 1 Freeman on Executions, §113. And, in support of his text, he cites cases to show that unmatured crops are "liable to voluntary transfer as chattels," "may be seized and sold under execution," and pass "to the executor or administrator of the occupier [of the land], if he die before he has actually cut, reaped or gathered the same." On the other hand, it is broadly stated in the American & English Encyclopædia of Law (vol. 4, p. 887) that: "Growing crops, before maturity and unsevered from the soil, are part and parcel of the land on which they grow, and pass with a conveyance of the land." Cases almost innumerable are cited as showing that this rule obtains in nearly every State in the Union. This text is then immediately followed by the statement (page 891) that: "Crops ripe for harvest are personal property; they pass to the executor, and not to the heir. They are liable to be seized on execution; and the officer may enter, cut down, seize, and sell the same as other personal estate." On the succeeding page it is said: "Although growing crops are part of the realty, unless severed from the soil, yet, for the purpose of levy and sale on execution, they

are suffered to be treated as personalty." Again, we find it stated in 6 Lawson's Rights, Rem. & Pr. §2681, that "crops, until they are gathered, are things immovable, or real estate, because they are attached to the ground"; but when "crops are gathered, they become movables, or chattels personal, because they are no longer attached to the soil. . . Corn, ripe, but standing uncut in the field, passes by deed of the freehold. Unharvested crops go to the devisee of the land, and not to the executor; but as against the heirs at law, they go to the executor." This statement is met by the assertion to be found in 3 Ballard's Annual on the Law of Real Property, §128, that, "Annual crops sown by the owner of the soil or his tenant, and which are the produce of industry and care while growing and immatured, are personal property"; whereas, in the first volume of the same work, (§111), it is said that, "As a general rule, growing crops, which have been planted by the owner of the soil, constitute a part of the realty; but this rule is held not to apply to crops which have matured and are ready to be harvested." Mr. Kerr says: "Growing crops planted by the owner of the soil are a part of the realty, and, as a general rule, will pass with it on conveyance. . . And this seems to be the case even though the crops are at the time standing in the field unharvested, although ripe, and the season for gathering them is long past. . . It is the general rule that a crop growing on land at the time of a sale under execution passes to the purchaser; and the same is true on a sale under a mortgage foreclosure. . . And growing crops are a part of the realty as between the successful plaintiff in an action of ejectment and the evicted defendant, where the crops were planted after the commencement of the action in ejectment. But the rule is otherwise where the grain was sown and harvested by one on lands to which he claimed title, and of which he was in actual possession. Crops planted by a tenant who holds under the owner of the soil are, as be-

tween the landlord and his tenant, personal property, and the tenant has the right to remove them; they become part of the realty, however, should the tenant voluntarily abandon or forfeit possession of the premises." 1 Kerr on Real Prop. §§50, 51. In the second volume of the same work, §958, the author says: "Where there are annual crops upon the land assigned to a widow as her dower, which were growing at the time of her husband's death, they will belong to her, and not to the heirs or executors of the husband; but if there has been a severance by the husband, as where he has assigned the crops to pay his debts, the wife will not be entitled to have dower assigned therein." So far as the offense of larceny is concerned, Mr. Bishop says that standing grain was at common law considered as realty, and it required statutory enactment to constitute an unauthorized taking of crops larceny in the several States where such act is made a crime. 1 Bish. New Cr. Law, §577. In Preston *v.* Ryan, 45 Mich. 174, Justice Cooley said, "While it is quite true that the growing crops are a part of the realty, yet for the purposes of levy and sale on execution, they are suffered to be treated as personalty." And there are numerous cases in which it has been held that where the owner of crops has undertaken to sell the same at private sale, before they matured or while ripe though ungathered, such crops, if grain or other agricultural produce raised annually, are to be treated as personalty for the purposes of such sale. The question as to whether such crops were personalty or realty, arose in considering the effect of the statute of frauds upon sales of this character. These decisions were confined, however, to sales of such crops only as were termed "emblements" at common law. Clark on Contracts, 106. Says Mr. Kerr, in dealing with the subject: "A distinction is to be observed between *fructus naturales*, or the natural growth of the soil, such as trees, grasses, herbs, fruit on trees, and the like, which at common law are part of the soil, and *fructus industriales*, or fruits

or products the result of the annual labor of man in sowing
and reaping, planting and gathering, which, though strictly
a part of the realty as much as those products which the
soil brings forth without man's intervention, are treated
as personal property for many purposes." 1 Kerr on Real
Prop. §53.    Mr. Bishop doubts much the soundness of the
distinction made in regard to crops of the latter kind, but
says, "The exception of deeming them personalty for most
civil purposes, even while attached to the soil, is probably
established too firmly in authority to be overthrown."
Bishop on Contracts, §1296.    For a full discussion of the
subject and a review of the leading cases, English and
American, see: Browne on the St. of Frauds (5th ed.), §235
et seq.; 1 Benj. on Sales, §113 et seq.; 4 Am. & Eng. Enc.
of Law, 893 et seq.; Blackburn on Sales, 5; 1 Addison on
Contracts, §206; Baker on Sales, §153; Tiedeman on Real
Prop. §799; Tyler on Fixtures, 732 et seq.; 3 Washburn
on Real Prop. 364 et seq.; 2 Addison on Contracts, §656 et
seq.; 2 Schouler's Personal Prop. §448 et seq.; Tiedeman
on Sales, §59.    In summing up, the author of the work
last cited says:    "The better opinion, independent of the
authorities, would seem to be that any contract which un-
dertakes to pass title to anything annexed to the soil, with-
out severance, is a contract for the sale of an interest in
land, whatever may be the character of the thing to be
severed, and falls within the fourth section of the statute."

Any one wishing to further entangle himself in the
mystic maze of uncertainty and contradiction in which the
law governing growing crops has become involved, may
profitably direct his attention to the legion of cases cited
by the various text-writers to whom we have above referred
—the field thus open to him is promising even unto dis-
traction.    Such a rich mine of abstruse legal learning is
doubtless of untold value.    It has not, however, proved
helpful in the decision of the present case, nor led us to
an understanding of the general principle underlying the

whole subject.    Indeed, we are free to confess, about the
only deduction we have been able to draw therefrom is that
a growing crop is a sort of legal species of chameleon, con-
stantly changing color to meet the emergency of each
particular class of cases in which the question arises
whether it is to be considered as personalty or as realty.
Amid all this glare of legal light, we have not been so for-
tunate as to find any case—or class of cases—like the pres-
ent, in which this creature of the law has thus arbitrarily
volunteered to assume its distinguishing hue.    Like a man
with many *aliases*, it presents itself sometimes under one
name—at other times under quite another; so that we may
not know how, upon special occasions, to address it.    Being
thus thrown upon our own resources, we feel at liberty,
and shall endeavor, to classify the plaintiff's unhappy crop
of cotton agreeably to our own understanding of the legal
status of growing crops at common law, and without regard
to the conflicting views entertained by the several authors
from whom we have above quoted.

We may in the outset remark that, in our opinion, grow-
ing crops, before actual severance from the soil, were con-
sistently regarded at common law as realty.    Whatever
incongruities may have crept into the law upon the sub-
ject as now understood in many jurisdictions, we believe
attributable alone to a misconception on the part of courts
of the present day of the rules which governed this species
of property under the feudal system prevailing in England
at an early period of its history.    Especially would it seem
that the principle which underlies the doctrine of emble-
ments has been too often overlooked, disregarded, misun-
stood or misconstrued.    Blackstone tells us that in feudal
times, when a common recovery suffered by the tenant of the
freehold had the effect of annihilating all leases for years
then subsisting, estates for years were necessarily of a pre-
carious nature and of short duration.    2 Bl. Com. 143.
The hardship attending a thus sudden termination of the

lessee's estate before he could reap the fruits of his toil by gathering his crops, appealed strongly for his protection. Relief was justly afforded by the courts upon the doctrine of emblements, designed to meet an emergency thus occasioned, whereby the tenant for years was given a right to gather that which he had in good faith planted. Not so, however, if a tenant whose term was certain sowed a crop he could not reasonably expect to be able to harvest before his term expired, or by his own act terminated his estate before his crops were matured and gathered; in the one case, because "it was his own folly to sow what he could never reap the profits of"; and in the other case, because his estate terminated by reason of his own default or caprice. 2 Bl. Com. 145. And in like manner was the doctrine applied as to tenants at will. *Ibid.* 146. It is proper to further observe that the right established by the doctrine of emblements was something more than a mere naked privilege accorded the outgoing tenant to sever from the soil his ripened crops (thus converting the same into personalty) and carry them off, along with such chattels belonging to him as might happen to be upon the premises at the termination of his estate. Growing and immature crops were also covered by this doctrine, which further gave to the tenant "the right of ingress, egress and regress so far as needful for due attention to and gathering" the same. 1 Kerr on Real Prop. §652. "The right to emblements includes the right to the land to cultivate and harvest them. 6 Lawson, Rights, Rem. & Pr. §2682. So it will be seen that the effect of the doctrine was to give the departing tenant a right to the use and sustenance of the soil for a period sufficiently long to mature his crops; thus, to this extent, extending the term of his original estate, and in consequence, depriving his successor in estate of the unrestricted use, and of all profits, of such lands as were necessary to the growing of the crops, until the same matured and were harvested.

If the doctrine of emblements extended no further, the tenant at will, the tenant for years, or the tenant *per auter vie*, would be fully protected—*provided he remained in life.* Otherwise, his very natural failure and omission to demand and enforce his right would inure to the benefit of his successor in estate, thus unjustly depriving the family and creditors of such tenant of the fruits of his toil. Neither creditors nor his heirs could enter upon the land and gather the crops without committing trespass, were this a right restricted to the tenant himself; although, had the tenant himself exercised this right before his death, his heirs and creditors could have gained a just benefit and advantage by reason of such exercise, the result of which would have been to convert the crops into personalty and render the same capable of due administration and distribution agreeably to law. But this emergency was foreseen. The maxim of the law, *actus Dei nemini facit injuriam*, was invoked, and the representatives of the deceased tenant were given the right to enter upon the land and gather the crops, after which, of course, having thus become converted into personal estate, they were subject to administration as such. See 2 Bl. Com. 122. Subsequently, the doctrine of emblements was still further extended to include crops planted by a tenant in fee who died before time for harvest, principally for the protection of creditors. *Ibid.* 404. And with much reason; for, as against creditors, the heirs to the inheritable estate had no just claim to profits derived therefrom before he succeeded to its possession—certainly not when, indeed, his ancestor may have been enabled to plant and tend such crops solely by reason of credit extended to him by such creditors.

The whole doctrine of emblements was based upon two reasons: (1) upon natural justice and equity; (2) upon grounds of public policy. The substantial merit of the first reason assigned is apparent; how public policy was subserved by an application of the doctrine, is explained by

Blackstone when he says, "the encouragement of husban-dry, . . being a public benefit, tending to the in-crease and plenty of provisions, ought to have the utmost security and privilege that the law can give it." 2 Bl. Com. 122. We have already shown that where the reason of the doctrine fails, it has no application; as where, for in-stance, a tenant terminates his estate through his own default or misconduct. In such case, the law, as it existed prior to the establishment of this doctrine, was suffered to apply in all its rigor, whereby a growing crop, until actually severed from the soil, was regarded as a part of the land itself, and passed accordingly. That this is true, is evidenced by the fact that the courts of England have uniformly held that at common law growing crops were not considered personalty before severance, and were therefore not the subject-matter of larceny. .1 Bish. New Cr. Law, §577; 2 Bish. Cr. Law (7th ed.), §763; 12 Am. & Eng. Enc. of Law, 781, 782, and notes; 2 Bl. Com. 404. Indeed, if at common law standing crops were regarded as personal property, the doctrine of emblements was needlessly de-vised, so far, at least, as ripened, though ungathered, crops were concerned. For we apprehend it was always the right of a tenant, upon a sudden and unexpected termination of his estate, to demand a reasonable time within which to gather up his household goods and other personal effects be-fore vacating the premises; and if his ungathered crops con-stituted a part of his chattels, he would have a reasonable time in which to gather and carry them away. The truth of the matter is, however, that before the introduction into the law of the doctrine of emblements, the tenant had no right to the usufruct of the land a single day beyond his term, nor to any profits thereof not arising strictly within the period of his right of occupancy. Conse-quently, after his estate had become fully determined, he would have no better right to claim standing crops than he would plough-bote; although, had he gathered his crops

or exercised his right as to plough-bote before the expiration of his term, his right to carry the one or the other off as personalty would certainly exist.    The doctrine of emblements is based, and proceeds solely, on the idea that the tenant is justly entitled to gather his crops even though his term has expired, and without regard to whether such crops are to be considered as in the nature of personalty or realty. Nor is the fact that at common law the executor of a deceased tenant was entitled to claim emblements any test as to the legal character of such crops while yet standing in the field.    Herein we disagree with the conclusion drawn by Mr. Freeman and other writers.    Formerly, under the common law rules of succession, the title to crops unsevered from the soil could not pass into the executor.    Under the doctrine of emblements, however, he was given the right to enter upon the land, in the name of the deceased tenant, and convert the crops into personalty by gathering the same and carrying them away; whereby the rules of succession governing personalty were given opportunity to ultimately take effect upon this species of property.

Again, as has been seen, many text-writers call attention to the fact that, at common law, an execution could be levied on a growing crop—evidently regarding this as persuasive authority for the statement that such crops were considered personalty.    In this view we cannot concur. As is well known, under the feudal system, alienation or encumbrance of estate was strictly prohibited.    Even a tenant in fee had no power to sell, mortgage or otherwise encumber the estate of inheritance held by him.    And so long as this restraint upon alienation continued, the owner in fee was, in effect, no more than a life-tenant.    Creditors had, therefore, to look solely for payment to property of their debtor in which he could, because having a right under the law to alienate the same, claim an unqualified and exclusive interest, and as to which the heir to the inheritable estate had no vested rights.    Crops raised by the

tenant in fee, being profits arising from the estate of freehold to which he was solely entitled were, of course, no part of the inheritance. They were therefore held subject to his debts—not upon the idea that they were personalty rather than realty—but upon the theory that they were a species of property in which the debtor had an unqualified and exclusive ownership. We believe the doctrine that all the property of a debtor, of every kind and description, of which he is sole owner, should justly be held subject to the payment of his debts, obtains even in this degenerate day. In this regard we find no inconsistency in the common law as to its treatment of growing crops as realty. On the contrary, the distinction between this class of property and mere chattels belonging to the debtor seems to have been strictly observed. The writ of *fieri facias* was restricted in its operation to the seizure of the "goods and chattels" of the debtor. To reach the *profits* of his lands (which consisted chiefly of crops grown thereon or rents issuing therefrom), the writ of *levari facias* was requisite, which writ remained in use until the writ of *elegit* (established by statute), conferring greater rights upon creditors, naturally displaced it in general practice. 3 Bl. Com. 417-420. It is, perhaps, proper to note in this connection, that, by special enactment of this State (Code, §3642), it is provided that growing crops shall be exempt from levy and seizure under execution until "matured and fit to be gathered," unless the debtor absconds or removes from the county or State. The purpose of this statute was merely to provide against a sacrifice of the debtor's property. In view of the fact that realty, as well as personalty, is subject in this State to seizure under execution, it would, of course, be absurd to draw the conclusion that this change in the law as previously existing was a recognition that at common law growing crops were considered personalty, and that the effect of the statute was to give such crops the character of realty.

We think the whole troublesome subject is pretty satisfactorily explained and relieved of much difficulty by the following extract which we take from 2 Bl. Com. 404. Says Blackstone, "*emblements* are distinct from the *real estate in the land,* and subject to many, though not all, the *incidents* attending personal chattels. They were devisable by testament before the statute of wills, and at the death of the owner shall vest in his executor and not his heirs; they are forfeitable by outlawry in a personal action; and by the statute 11 Geo. II. c. 19, *though not by the common law,* they may be distreined for rent arrere. The reason for admitting the acquisition of this special property by tenants who have temporary interests, was formerly given; and it was extended to tenants in fee, principally for the benefit of their creditors; and therefore, though the emblements are assets in the hands of the executor, are forfeitable upon outlawry, and distreinable for rent, *they are not in other respects considered as personal chattels*; and particularly, they are not the object of larceny, before they are severed from the ground." We understand this distinguished writer to mean, when he says "emblements are *distinct* from the *real estate in the land,*" that they constitute no part of the *inheritance,* as between the heir thereto and the legal representatives of the tenant in fee, but are to be regarded as merely *profits* arising out of the land, rather than an integral part of the land itself *considered as a vested estate*; or, as between a lessee and the owner of the *freehold estate,* that emblements never become attached to the land in such manner as to constitute a permanent part of the realty comprising such freehold estate, but, as profits to which the lessee alone is entitled, are distinct from the land itself, and vest exclusively in him. In fact, the doctrine of emblements was designed for the very purpose of effecting such a separation, and declaring emblements "distinct" from the "real estate in the land," no matter in whom such estate vested.

by reason of the sudden expiration of the tenant's term.
It will be noted that Blackstone does not say that *growing
crops* are distinct from the land upon which they are
grown, but only that they are so after they become "em-
blements."    Of course, where the doctrine of emblements
has no application, growing crops cannot be considered
as "emblements" at all.    As, for instance, when at the
present day the owner of land in fee simple has an unquali-
fied and exclusive interest therein, himself plants the crops
and remains in undisturbed possession of the premises, no
such distinction between the land and unharvested crops
growing thereon is properly to be considered.    Thus, it is
the almost universal rule in this country, that where such
owner voluntarily sells his lands without expressly reserv-
ing a right to enter and gather growing crops planted there-
on, such crops are to be regarded as realty, and, as such,
pass to the purchaser.    See the collection of cases cited in
4 Am. & Eng. Enc. of Law, 887.

It will further be observed that Blackstone seems very
studiously to avoid characterizing even "emblements" as
personalty, but very happily, we think, remarks instead that
they are "subject to many, though not all, the *incidents*
attending personal chattels."    And herein we believe he
has struck the keynote explaining how, in later times, grow-
ing crops have come to be considered personalty, simply
because, the law having placed upon them many incidents
common alike to chattels, no reason ordinarily exists for
observing their true status as realty; and therefore the
distinction which really still survives between them and
mere chattels has not been clearly and consistently kept in
view.    Under various rules of law, many "incidents" at-
tend, and are alike common to, both real and personal prop-
erty.    For instance, a new and special tax upon property
might be laid upon both realty and personalty, irrespective
of their inherent character, and yet this would really make
them no closer kin than they were before.    We have al-

ready seen that at common law, while estates of inheritance were not subject to be levied on under execution, growing crops were held liable for the claims of creditors, simply because the exclusive ownership of such crops was vested in the debtor, and the heir to the inheritance had no interest therein.    As crops raised by the debtor were, perhaps, the only species of realty of which this was true, and as all chattels were held subject to execution, it is not strange that, in course of time, the impression should take root in the minds of those not familiar with or not recalling the history of this rule of law and the reasons upon which it was based, that no distinction existed between these two kinds of property, especially as in other respects no difference in the treatment of either was observed.

That growing crops were subject to forfeiture upon outlawry, may likewise be explained upon the idea suggested why crops were subject to execution, viz: that the debtor had an alienable, and therefore exclusive, interest therein. In the initial or preliminary proceedings to outlawry, if the recreant debtor persistently failed to obey the summons of the court, a writ was issued "commanding the sheriff to distrein the defendant from time to time, and continually afterwards, by taking his goods and the *profits of his lands*, which are called issues, and which he forfeits to the king if he doth not appear."    3 Bl. Com. 280.    So it will be seen that his crops were reached, and forfeited, not as chattels, but as "profits of his lands."

We have already explained how emblements came to be vested in the executor, instead of descending to the heir. The remaining "incident" referred to by Blackstone, viz: that emblements "were devisable by testament before the statute of wills," will readily be understood as a natural sequence of the doctrine of emblements.    As thereunder the executor was empowered to reduce his testator's crops to possession, the latter could very properly direct in his testament what disposition should be made of the same

after they had been so reduced to the executor's possession and had thereby become converted into personalty belonging to the testator's estate.

We shall not, in the present case, undertake to enter upon any discussion of the effect of the statute of frauds upon private sales of growing crops made by the owner thereof, preferring to make no attempt to successfully cross this dangerous legal bridge until necessity brings us to it. As it would appear an unpromising and impracticable task to try to reconcile the many decisions, English and American, in which this question has been dealt with and discussed, we could hope to gain no fuller light as to how, in point of fact, growing crops were classified at common law. So we may dismiss the topic by merely remarking that if "for the purposes of such sales, emblements are suffered to be treated as personalty," the case with which we are now dealing does not fall within this exception to the general rule; nor, indeed, within any other of the "exceptions" referred to by text-writers, or of which we are aware.

We cannot refrain from remarking, in this connection, the embarrassment we have experienced arising out of the practice, which seems to have sprung up in some jurisdictions, of arbitrarily regarding growing crops as personalty for one purpose, and as realty for another. In the very nature of things, this species of property, being tangible in form and possessing many marked inherent characteristics, is capable of being properly classified, and should be given a fixed legal status. Of course, where there is no imperative necessity for strictly observing and remarking the distinction existing between two entirely different species of property—as where rules of law operating alike upon either class are merely to be construed and enforced,—no vicious consequence or positive harm immediately results from "treating" them as though they were identical in character, or even in inaccurately styling something "personalty"

41

which should properly be referred to as "realty." But the importance of preserving, if possible, absolute consistency in the entire fabric of our law—thus rendering the same unequivocal, and therefore more readily and more clearly comprehended,—should by no means be overlooked. The justice of this critical observation is evidenced by the utter confusion in which we find the law upon the subject with which we are now dealing to be involved.

That growing crops cannot properly be "treated" as personalty under the law as understood in this State, seems indisputable in view of the definition of realty contained in section 2218 of the code, which purports to be declaratory of the common law, and which reads as follows: "Realty, or real estate, includes all lands and the buildings thereon, and all things permanently attached to either, *or any interest therein or issuing out of, or dependent thereon.*" Following this definition, it was held in *Coody* v. *Gress Lumber Co.*, 82 *Ga.* 793, that: "Trees growing upon land constitute part of the realty; and a sale of them, under the statute of frauds, must be in writing." And in *Frost* v. *Render*, 65 *Ga.* 15, wherein it appeared that a sheriff sold under execution land upon which was growing a crop of cotton, it was held that: "A levy being on certain land as the property of the defendant in *fi. fa.*, a sale under such levy carries with it the crop growing on the land, and the sheriff cannot limit the sale by an announcement that the rent of the current year is reserved"; for the reason that the law considers growing crops part and parcel of the land itself, following its ownership as a mere element of value incident thereto. This is certainly the general rule which obtains in this State, and we know of no exceptions thereto which have gained any foothold in our law on the subject. A review of the decisions previously rendered by this court in cases wherein the question as to the legal character of growing crops arose, shows that they are all in harmony with the conclusion reached in.

the present case.   In *Pitts* v. *Hendrix*, 6 *Ga.* 452, it was held that:   "A growing crop of corn, after it is laid by, and before maturity, passes to the purchaser of the land." This case was cited and followed in *Ferguson* v. *Hardy*, 59 *Ga.* 758, wherein the question arose as to whether the title to crops growing on lands sold under execution passed to the purchaser, as against the defendant in *fi. fa.*   In the more recent case of *Dollar et al.* v. *Roddenbery*, 97 *Ga.* 148, the question was presented whether such a purchaser also acquired title as against a tenant who planted the crops, and whose estate was terminated thus suddenly by a sale of the lands; and, upon the doctrine of emblements, this question was decided in the negative.   This decision was, of course, rendered without regard to whether the crops were to be considered as personalty or as realty, being based solely upon the idea that the tenant was entitled to the crops as "emblements," which, even though a part of the realty, were nevertheless not included in the sale of the land; for no greater interest than the landlord had therein could be sold under execution as *his* property, and of course the purchaser got only that which was in fact sold.

Again, in the case of *Scolley* v. *Pollock*, 65 *Ga.* 339, wherein there was a contest between a judgment creditor of a tenant and one who claimed cotton levied on by virtue of a prior purchase from the tenant of his immatured crop, and who had accordingly entered upon the land, cultivated the crop and harvested it when ripe, the decision in *Pitts* v. *Hendrix, supra,* was cited approvingly, and it was further said:   "Before maturity, the crops only constitute an element of value, and are not themselves distinct chattels. We know of no ruling to the contrary by this court."

There only remains to be noticed the decision in *Hamilton* v. *The State*, 94 *Ga.* 770, wherein the accused was charged with having fraudulently sold and disposed of personal property upon which she had previously given a mortgage, contrary to the provisions of §4600 of the code.   The

indictment against her alleged that, having mortgaged her crops in May, she in the following November fraudulently sold and disposed of the same without the consent of the mortgagee, and with intent to defraud him, whereby he sustained loss.    The point was raised that a mortgage given upon a growing crop could not properly be regarded as a mortgage upon personalty.    The decision of the court in that case was pronounced by the writer of this opinion. In dealing with the question thus raised, the destinction drawn between growths that are *fructus naturales* and those termed *fructus industriales* was stated and to a limited extent discussed, Corbin's Benjamin on Sales (vol. 1, §126), and note to Morris *v.* Watson, 55 Am. Dec. 162, being referred to as showing that this distinction had been recognized and followed by many courts of high repute.    The subject did not then, however, receive the careful and laborious investigation which this opinion evidences; and it was not necessary, for we did not rest our decision on the ground that the crops were to be deemed personalty at the time the mortgage upon the same was given, but called attention to this widely recognized distinction, merely as persuasive argument tending to show that in any view of the case the conviction of the accused was right.    As will be perceived from the concluding remarks of the opinion then delivered, the ground upon which we rested our decision was, that whatever might be the character of the crops when mortgaged, if the accused fraudulently disposed of the same after maturity, so that they were removed from the land and carried beyond the reach of the mortgagee, the offense with which she was charged would unquestionably be complete.    The record before us did not disclose whether she gathered the crops herself, and afterwards carried them off and sold them, or whether the sale took place while the crops yet stood, ripe but ungathered, in the field.    But we did not then, nor do we now, think this would make any difference.    Even in the latter event, the

produce of these matured crops being the subject-matter of sale, and their separation from the land being necessarily contemplated and included in the terms of sale, severance from the soil would be an essential incident to an effectual delivery; and until actually delivered, the sale would remain executory and incomplete. Unquestionably, the lien of the mortgage adhered to the crops as effectually after severance as before. 1 Cobbey on Chattel Mortgages, §380. "A mortgage of a growing crop follows the matured and harvested grain." *Ibid.* §381. And a mortgage lien on a crop is not lost by any natural change in its condition. *Ibid.* §379. Therefore we concluded that, irrespective of whether such crops should properly be considered as personalty while yet immatured and growing in the field, "the crop in question being personalty when sold and being then subject to the mortgage, it does not matter whether it was personalty or not at the time it was mortgaged."

The foregoing comprises all the cases of which we have any knowledge, in which this court has dealt with the subject presented by the case at bar.

In the foregoing discussion we have faithfully endeavored to dissipate the darkness which overhangs and envelops the subject at the present day, and to show that at common law no inconsistency in the treatment of growing crops as realty in fact existed, even though *emblements* were subjected to many of the *incidents* which attached to chattels. Whether or not this attempt has been successful, we leave to the reader to determine. That the proper result in this particular case has been reached, we are entirely convinced, and cannot regard as even debatable. The plaintiff was the owner, not only of the crop destroyed, but also of the land upon which it was growing. His crop, therefore, cannot possibly fall within the term "emblements," nor properly be considered as even constructively constituting a species of property distinct from the land

upon which it was growing at the time it was destroyed by fire.

3. Our conclusion, therefore, is that the justice's court had no jurisdiction to entertain the plaintiff's action. In reaching this result, we have endeavored not to be unduly swayed in our judgment by the importance of this particular case, nor deterred by the thought of the consequences which must inevitably ensue. After deliberate reflection, and after a most painstaking investigation of the law, we are constrained to hold that the recovery of *six dollars* which the plaintiff obtained in the magistrate's court cannot legally be upheld. *Judgment affirmed.*